UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES L. KELLY,

        Plaintiff,

v.                                 Case No. 3:22-cv-884-BJD-LLL

MAJOR JASON CARTER, et al.,

        Defendants.

_____

## ORDER

### I. Status

Plaintiff, James Kelly, a former inmate of the Florida Department of Corrections (FDC), is proceeding *pro se* and *in forma pauperis* on a second amended complaint (Doc. 7; Compl.) against two officers at Hamilton Correctional Institution (HCI) for excessive force and deliberate indifference under 42 U.S.C. § 1983 and assault and battery under state law.[1] Before the Court are two motions: (1) Defendants' motion for summary judgment (Doc. 70; Def. Mot.); and (2) Plaintiff's motion for spoliation of electronically stored evidence (Doc. 73; Pl. Mot.). Plaintiff opposes the motion for summary

_____

[1] The Court dismissed the claims against a third Defendant for Plaintiff's failure to locate that Defendant for service of process. *See* Order (Doc. 74).

judgment (Doc. 79; Pl. Resp.), and Defendants filed a reply (Doc. 86; Def. Reply). Defendants oppose Plaintiff's motion for spoliation sanctions (Doc. 82; Def. Resp.).

## II. Facts[2]

The relevant facts are drawn from Plaintiff's verified second amended complaint,[3] Defendants' exhibits in support of their motion for summary judgment (Docs. 71-1 through 71-8; Def. Mot. Exs.), and Plaintiff's exhibits in opposition to Defendants' motion for summary judgment (Docs. 79-2 through 79-13; Pl. Resp. Exs.).

### A. Plaintiff's Complaint

Plaintiff alleges the events occurred at HCI on April 5, 2022, when he was being moved to administrative confinement because he had incurred a disciplinary charge. *See* Compl. at 21. Defendant North and former Defendant Doe (Officer "G") were escorting him to "H" dorm following a pre-confinement medical exam. *Id.* at 21–22. Plaintiff alleges both Defendant North and Officer "G" were present for his pre-confinement exam, so they knew he had diagnosed mental and physical problems, including medical passes for a cane and to be

---

[2] The facts summarized here are those relevant to liability. Facts relevant to injuries will be summarized later in this Order.

[3] A plaintiff's allegations in his verified complaint are to be given the same weight as an affidavit. *See Stallworth v. Tyson*, 578 F. App'x 948, 950 (11th Cir. 2014).

housed in a lower tier/bottom floor cell. *Id.* at 23, 27. Despite knowing of Plaintiff's lower tier pass, Officer "G" instructed Plaintiff to walk up the stairs to be housed in an upper tier cell. *Id.* at 23–24. Plaintiff was handcuffed behind his back and did not have his cane at the time. *Id.* at 24. Defendant North was already on the upper tier. *Id.* at 26.

Plaintiff informed Officer "G" he could not walk up the stairs, causing Officer "G" to "bec[o]me fully belligerent and hostile," saying he would "beat [Plaintiff's] ass and pepper spray him if he did not walk" upstairs to his assigned cell. *Id.* at 24. According to Plaintiff, he started having a panic attack and declared a psychological emergency at least three times, which both Officer "G" and Defendant North heard. *Id.* at 25. His requests were not honored, and Officer "G" instead "push[ed]" him toward the stairs, causing Plaintiff to lose his balance and fall on his buttocks. *Id.* at 25–26. Trying to control his anxiety, Plaintiff lay face-down on the stairs, and Officer "G" held him down. *Id.* at 26. Plaintiff claims all events were captured on surveillance video. *Id.*

When he was being held face-down on the stairs by Officer "G," Plaintiff "felt an explosion of pain on the back side of his head rendering him momentarily unconscious." *Id.* at 28. Plaintiff claims that Defendant North, who was standing above him on the top tier, "purposely aimed . . . and threw a set of forged steel . . . handcuffs" at him, hitting him in the head, causing it to

3

swell and bleed. *Id.* at 28, 30. Defendant North descended the stairs, picked up his handcuffs, said to Plaintiff, "It only gets worse," and walked away. *Id.* at 29. Again, Plaintiff says these events were captured on video. *Id.* Plaintiff alleges, "It has since been determined by medical that [he] has permanent nerve damage at the base of his skull . . . [and] severe migrain[e] type headaches." *Id.*

After Defendant North walked away, Officer "G" took Plaintiff to a holding cage. *Id.* at 30. Plaintiff again declared a psychological emergency, but Officer "G" merely "taunted" and threatened him. *Id.* at 30–31. At some point, Defendant Carter, a Major, walked through the dorm, and Plaintiff reported to him what happened. *Id.* at 33. Plaintiff asked that "a 'use of force' report [] be made and to see medical under emergency," but Defendant Carter took no action, responding only that he would "look into it." *Id.* at 33–34.

**B. Exhibits**

Plaintiff identifies a witness in his complaint. *Id.* at 28–29. Defense counsel took the deposition of Plaintiff's witness, Julio Rodriguez, who testified to the following series of events. Officer "G" and Defendant North were escorting both him and Plaintiff to administrative confinement after bringing them for their pre-confinement physicals. *See* Def. Mot. Ex. E at 11–12. Once in "H" dorm, Defendant North escorted Rodriguez upstairs to his cell, while

4

Officer "G" escorted Plaintiff. *Id.* at 13. Rodriguez heard Plaintiff declare a psychological emergency and observed events from his upper tier cell window, which was about ½ foot by three feet. *Id.* at 13–14. Rodriguez saw Plaintiff fall, but he does not know why or how he fell. *Id.* at 14–15. Plaintiff was lying on his left side facing Rodriguez's cell, and Officer "G" had his right knee on Plaintiff's shoulder, holding him down. *Id.* at 15, 17. Rodriguez claims he saw Defendant North "thr[o]w handcuffs at [Plaintiff]" underhanded but aiming at Plaintiff's head, striking the left side of Plaintiff's head. *Id.* at 15, 18–19, 24–25.

Rodriguez also signed a declaration under penalty of perjury in which he avers to the facts relayed at his deposition: he heard Plaintiff declare a psychological emergency, and after Defendant North placed him (Rodriguez) in his cell, North walked to the top of the stairs, "[took] aim at [Plaintiff's] head with the handcuffs . . . and threw them . . . hitting [Plaintiff] in the head." *See* Pl. Resp. Ex. B. at 4. Rodriguez further avers that, when he and Plaintiff were taken for their pre-confinement physicals, "officers ['G' and North] were present in the exam room as per security." *Id.* at 2–3.

Plaintiff offers his own declaration in which he explains that, even though he was lying on his side and pinned down on the stairs, he was moving

his head around and was able to see Defendant North "aiming for [his] head" with the handcuffs. *See* Pl. Resp. Ex. C at 3.

Defendants do not offer their own declarations. Instead, they rely on the following: the declaration of Nurse Kellie Caswell; FDC records related to Plaintiff's disciplinary charge and custody status; the deposition transcript of inmate Rodriguez; medical records; and specifications (including weight) for the brand of handcuffs FDC officers use. *See* Def. Mot. Ex. A–H.

### III. Plaintiff's Claims & Summary Judgment Motion

Plaintiff asserts the following claims: (1) deliberate indifference against Defendant North for ignoring his psychological emergency; (2) deliberate indifference against Defendant Carter for ignoring his medical emergency; (3) excessive force against Defendant North for intentionally throwing handcuffs at his head knowing he was suffering from a psychological emergency; and (4) assault and battery against Defendant North. *See* Compl. at 37–38.

Defendants move for summary judgment on the following grounds: (1) Plaintiff fails to state a plausible excessive force claim against Defendant North because his allegations are no more than "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action"; (2) throwing handcuffs at an inmate does not amount to excessive force as a matter of law; (3) Plaintiff fails to state a plausible deliberate indifference claim against

6

Defendant North or Defendant Carter; (4) Plaintiff cannot prove state-law intentional torts; and (5) Plaintiff is not entitled to compensatory damages under the Prison Litigation Reform Act (PLRA). *See* Def. Mot. at 9–10, 12, 17–18, 22.

### A. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on

a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## B. Claims Against Defendant North for Allegedly Throwing Handcuffs at Plaintiff

It is well understood that prison guards, who are charged with maintaining order and security, may use force when necessary. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991). However, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without

8

penological justification." *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987). As such, gratuitous beatings, even those that do not cause serious injury, violate the Eighth Amendment's proscription against cruel and unusual punishments. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). The Supreme Court has held, "The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 37 (internal punctuation omitted).

When an officer uses force to restore order or maintain security, whether that force can be classified as "excessive" requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to staff and inmates, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. *See Williams*, 943 F.2d at 1575; *Whitley*, 475 U.S. at 321 ("*Whitley* factors"). *See also Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002).

Defendant North denies having thrown handcuffs at Plaintiff and primarily disputes Plaintiff's allegations, arguing they are conclusory, and his

story (as told by himself and Rodriguez) is contradictory and implausible. *See* Def. Mot. at 9–11. According to Defendants, Plaintiff could not have seen Defendant North aim and throw handcuffs at him if he had been face-down on the stairs as he alleges, thus making his "malicious and sadistic" allegations merely a recitation of the elements of a cause of action. *Id.* at 9. Additionally, they argue that Rodriguez's statements are "not credible" because he was watching events through "a tiny window" from 20 to 25 feet away, and he claims the handcuffs hit Plaintiff on the left side of the head while also maintaining Plaintiff was lying on his left side. *Id.* at 10–11. Finally, Defendants argue "tossing a pair of handcuffs underhanded, [sic] amounts to negligence" or is not the sort of conduct that is repugnant to the conscience of mankind. *Id.* at 12, 15.

First, Plaintiff's allegations go beyond mere conclusions or a recitation of the elements of an excessive force claim. He contends Defendant North, standing above him by at least a flight of stairs, intentionally and with no penological purpose threw handcuffs at him after he fell and was in the throes of a psychological emergency. *See* Compl. at 25, 28. These are factual allegations, not conclusions. Second, the parties tell conflicting stories with respect to Defendant North's conduct and the extent of any resulting injuries. Plaintiff alleges and points to some evidence that Defendant North

10

intentionally threw handcuffs at his head from some unknown distance and height, which caused some injury, *see id.*, while Defendant North, who does not recall the incident, disclaims having ever "thrown a set of handcuffs in any setting," *see* Pl. Resp. Ex. A at 3.

Despite Defendant North's lack of memory about the incident, Defendants implicitly acknowledge there was no need for Defendant North to have used any force against Plaintiff but argue that had Defendant North thrown handcuffs at Plaintiff's head, they did not weigh enough to have resulted in an injury or to constitute more than a *de minimis* use of force. *See* Def. Mot. at 14–15, 17. *See also* Def. Mot. Ex. F. This argument is unconvincing. Not only is there no evidence regarding the force with which the 11.2 oz. handcuffs would have hit Plaintiff from the distance and height Plaintiff claims they were thrown, but, even if only a minor injury resulted, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *See Wilkins*, 559 U.S. at 38.

Moreover, Plaintiff points to some evidence that he did indeed sustain some serious injuries from being hit in the head. *See* Pl. Resp. Exs. G, H. Defendants' argument presumes no injury and discounts or ignores that Plaintiff allegedly was suffering a psychological emergency while already being restrained by another officer. At this stage of the proceedings, the *Whitley*

11

factors balance in Plaintiff's favor: there was no need to use force; the extent of the force used is unclear, as noted (i.e., the weight of the handcuffs combined with the height and distance from which they were thrown); it appears Plaintiff posed little to no threat of harm to staff and inmates given he was restrained; the evidence suggests no attempt was made to "temper the severity of a forceful response" given, as alleged, it was gratuitous, and Defendant North verbally taunted Plaintiff afterward; and Plaintiff points to some evidence showing he sustained serious head or neurological injuries. *See Williams*, 943 F.2d at 1575. Viewing the facts and drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude Defendant North used force maliciously and sadistically for the very purpose of causing harm.

To Defendants' argument that Plaintiff's story is contradictory, implausible, or not credible, such considerations are for a jury, not for a court to decide on summary judgment. *See Mize*, 93 F.3d at 742 ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."). Although a jury could conclude Plaintiff's and Rodriguez's explanations of events are unbelievable or inconsistent, the Court cannot wholly discredit Plaintiff's version of events at this juncture.

12

Neither Plaintiff's nor Defendants' version of events is contradicted by indisputable evidence, such as video footage, and a district court may not make credibility determinations in favor of one party over the other. *See Sears v. Roberts*, 922 F.3d 1199, 1206, 1208–09 (11th Cir. 2019) (reversing the district court's entry of summary judgment in favor of the officer-defendants because the officers' documentary evidence, including disciplinary reports and affidavits, consisted of "various forms of their own testimony," which directly contradicted Plaintiff's sworn allegations). The record presents "a classic swearing match, which is the stuff of which jury trials are made." *Id.* at 1208 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)). On this record, Defendants are not entitled to summary judgment on the excessive force claim against Defendant North.

Finding Plaintiff survives summary judgment on the excessive force claim, his state-law assault and battery claims accordingly survive as well. *See Pena v. Marcus*, 715 F. App'x 981, 988 (11th Cir. 2017) (defining assault and battery under Florida law); *Christie ex rel. estate of Christie v. Scott*, 923 F. Supp. 2d 1308, 1329 (M.D. Fla. 2013) ("If the force used was 'clearly excessive and not 'reasonable under the circumstances,' the [corrections officers] may be liable for assault and battery under Florida law." (citation omitted))).

13

## C. Claims Against Defendants North & Carter for Deliberate Indifference

Plaintiff asserts a deliberate indifference claim against Defendant North for ignoring his psychological emergency and against Defendant Carter for ignoring his medical emergency. *See* Compl. at 26–27, 33, 37. Defendants argue they are entitled to summary judgment on these claims because Defendant North was not the one escorting Plaintiff and, therefore, not in a position to act on Plaintiff's request for psychological intervention, and, with respect to the claim against Defendant Carter, Plaintiff did not have a serious medical need. *See* Def. Mot. at 17–18. Additionally, Defendants contend their conduct caused Plaintiff no injuries. *Id.*

In the medical context, deliberate indifference to an inmate's serious medical needs constitutes the unnecessary and wanton infliction of pain, which the Eighth Amendment proscribes. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983."). Indeed, the Eleventh Circuit has held, "The knowledge of the need for medical [or mental health] care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). *See also Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("[A] prison inmate has the right

14

under the Eighth Amendment to be free from deliberate indifference to serious physical or psychiatric needs.").

To survive summary judgment on a deliberate indifference claim, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' [sic] deliberate indifference to that risk; and (3) causation." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting in part *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)). *See also Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Stated another way, an inmate must show a prison official "actually (subjectively) knows that [he] is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994) (footnote omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### i. **Defendant North**

Viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact whether Defendant North was deliberately indifferent to a serious medical need. Plaintiff presents evidence showing or

permitting the reasonable inference that Defendant North knew Plaintiff suffered from mental health issues for which he was under treatment; was nearby when Plaintiff declared a psychological emergency; observed Officer "G" pin Plaintiff to the stairs while Plaintiff was having a psychological emergency; and threw handcuffs at Plaintiff's head, verbally taunted him, and walked away. A jury hearing these facts could conclude Defendant North knew Plaintiff had a serious medical need and drew the inference that Plaintiff was at a substantial risk of serious harm but responded to that risk in an objectively unreasonable manner, causing Plaintiff to suffer emotionally or physically. *See Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

### ii.   Defendant Carter

Plaintiff's deliberate indifference claim against Defendant Carter does not fare as well. Plaintiff faults Defendant Carter for not obtaining immediate medical attention for him after he was hit in the head with handcuffs. *See* Compl. at 33–34, 37. He alleges he informed Defendant Carter that he "had just been physically assaulted, held down and struck in the head with a weapon . . . for invoking a valid . . . [medical] pass." *Id.* at 33 (emphasis omitted). Plaintiff alleges that his head was bleeding from being hit with handcuffs, but he does not allege that he told Defendant Carter as much or that Defendant Carter observed blood. *See id.* at 32, 37. According to Plaintiff, he asked

16

Defendant Carter "to see medical under emergency with no result or actions [taken] by [Defendant] Carter," other than to say that "he'd look into it." *Id.* at 33–34 (emphasis omitted). Defendants argue that "Plaintiff did not have a serious medical need nor [sic] sufficiently requested medical attention to [sic] Defendant Carter" and note that Plaintiff does not rebut their argument as to Defendant Carter in his response. *See* Def. Mot. at 18; Def. Reply at 2–3.

Whether Plaintiff sustained an injury from the handcuffs hitting his head appears to be disputed, as discussed more below. However, there is no evidence Plaintiff physically presented or Defendant Carter observed symptoms obviously indicative of a "serious medical need" as that phrase is defined under Eleventh Circuit law:

> one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

*Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (internal quotation marks omitted). Under this standard, a "serious medical need" is one that, "if left unattended, poses a substantial risk of serious harm." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

Accepting that Plaintiff told Defendant Carter he had been hit in the head and wanted to go to medical, there is no evidence Plaintiff—at that time— had an obvious physical problem that a lay person would understand

17

necessitated immediate medical attention. Indeed, the first time Plaintiff received medical attention for injuries he attributed to the incident was nearly a month later, on May 2, 2022. *See* Pl. Resp. Ex. G at 2. Even if Defendant Carter had an obligation to report or investigate the incident Plaintiff reported to him, Plaintiff's claim fails. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."). *See also Marbury*, 936 F.3d at 1238 (explaining that a prison official's "failure to investigate [an inmate's] allegations of threats or to follow policy in reporting potential threats up the chain of command" does not constitute deliberate indifference absent allegations or proof of the official's "subjective awareness of a serious risk of harm"). In short, there is no evidence that Defendant Carter was aware of facts permitting *him* to draw the inference Plaintiff had an injury that, if left unattended, posed a substantial risk of serious harm to Plaintiff.

For the above reasons, Defendants' motion is due to be granted in part only to the extent Defendant Carter is entitled to summary judgment on the deliberate indifference claim asserted against him. The deliberate indifference claim against Defendant North, however, will proceed.

### D. Compensatory Damages Under the PLRA

Defendants argue Plaintiff claims to have sustained only *de minimis* injuries and therefore is not entitled to recover compensatory damages under the PLRA. *See* Def. Mot. at 22. In his complaint, Plaintiff alleges having suffered numerous injuries attributable to being hit in the head with handcuffs: loss of consciousness; concussion; abrasion; pain; headache; dizziness; nausea; and permanent nerve damage. *See* Compl. at 32.

Defendants offer the declaration of Nurse Caswell, who avers that "[Plaintiff] has been evaluated by medical for migraine headaches and arm pain," but there is no evidence Plaintiff has been receiving "ongoing treatment related to April 5, 2022." *See* Def. Mot. Ex. H ¶ 11. Additionally, Defendants note that Plaintiff was evaluated by mental health the day after the incident and reported, "I don't need to come out, I'm good right now," and he was seen in sick call on April 21, 2022, "but merely requested additional copies of his medical pass." *See* Def. Mot. at 24; Def. Mot. Ex. B at 182, 185.

Despite Nurse Caswell's declaration, Plaintiff points to some evidence showing he was treated for conditions he attributes to the "head trauma" or "head injury" that is the subject of his complaint. *See* Pl. Resp. Exs. G, H. On May 2, 2022, Plaintiff complained of "chronic migraine like headaches," which caused his head to throb for four to five hours. *See* Pl. Resp. Ex. G at 2. He

19

reported that "his migraines [were] more frequent . . . after head trauma [one month] ago." *Id.* On May 17, 2022, Plaintiff again complained of migraines or headaches, saying his head hurt so bad it made him cry. *See* Pl. Resp. Ex. H at 2. He reported "intense throbbing," which was not helped by pain medications. *Id.* He also said he was experiencing numbness in his fingertips. *Id.* Notably, contrary to Nurse Caswell's declaration, headaches, neck pain, or numbness are documented in subsequent medical records, including diagnostic tests or scans, and in Plaintiff's sick-call requests. *See* Def. Mot. Ex. B at 34–35, 37, 57, 62–63, 66, 74–75, 93, 95, 98–105, 128, 131, 136–37, 140–41, 143–44, 161.

Even if Plaintiff's medical records do not expressly link the date of the incident (April 5, 2022) to a specific physical injury (i.e., headache, migraine, or nerve problems), there is evidence that Plaintiff was treated within a month of the incident for injuries he attributes to the relevant events, and Nurse Caswell is not offered as an expert who can opine on medical causation. That Plaintiff told a mental health provider on April 6, 2022, he had no "concerns" to report regarding his *mental health* does not dictate the conclusion he could not have sustained or later developed physical injuries from the prior day's events. Finally, although Plaintiff was seen in sick call on April 21, 2022, and did not complain of any physical problems, that record cannot be considered in a vacuum. Plaintiff reported physical symptoms on May 2 and 17, 2022, and

20

on subsequent dates, which he attributed to the head trauma he claims to have sustained on April 5, 2022.

To the extent Plaintiff can prove he sustained a concussion, migraines, nerve damage,[4] or any other neurological condition from being hit on the head with a pair of handcuffs, such injuries are more than *de minimis*. *See, e.g.*, *Flanning v. Baker*, No. 5:12-cv-337-MW-CJK, 2016 WL 4703868, at *6 (N.D. Fla. Aug. 16, 2016), *report and recommendation adopted*, 2016 WL 4703862 (N.D. Fla. Sept. 7, 2016) ("A concussion and migraine headaches may be considered more than *de minimis* injuries."). In other words, whether Plaintiff can prove any physical injuries he reported about a month after the incident and thereafter were causally related to Defendant North's conduct is a different inquiry than whether the injuries he claims to have sustained can be characterized as *de minimis*. *See, e.g.*, *Norfleet v. Taylor*, No. 3:16-cv-413-MCR-EMT, 2017 WL 7054010, at *18 (N.D. Fla. Nov. 27, 2017), *report and recommendation adopted*, 2018 WL 564859 (N.D. Fla. Jan. 25, 2018) ("It is for the jury to weigh any skepticism concerning [the plaintiff's] self-diagnosis and lack of objective medical evidence against the obvious fact that inmates, unlike

---

[4] It appears Plaintiff's nerve issues may be wholly or partially attributable to a cervical disc herniation, diagnosed in December 2022. *See* Pl. Resp. Ex. I at 2. He had a follow-up for his disc herniation on January 6, 2023. *See* Pl. Resp. Ex. J at 3. Any causal relationship between the handcuff incident and Plaintiff's documented physical problems (including disc herniation and nerve damage) is unknown.

21

plaintiffs in other settings, are generally unable to obtain medical care—and perhaps medical opinions—of their choice."). Viewing the evidence and drawing all inferences in Plaintiff's favor, there remains a triable issue whether he sustained an injury that is more than *de minimis* from being hit in the head with a pair of handcuffs.

### E. Conclusion on Motion for Summary Judgment

Given Defendants are not entitled to summary judgment on all claims, this case is in a posture to proceed to a settlement conference and, if settlement negotiations fail, to trial. The Court finds Plaintiff is entitled to the appointment of counsel to assist him. *See* 28 U.S.C. § 1915(e)(1); *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999). As such, the Court will refer this case to the Jacksonville Division Civil Pro Bono Appointment Program so the designated deputy clerk of the Court may seek counsel to represent Plaintiff.

### IV. Plaintiff's Spoliation Motion

Plaintiff contends that he requested video footage of the relevant incident be preserved, but it nonetheless was destroyed, prejudicing his ability to prove his claims. *See* Pl. Mot. at 2–4. As relief, he requests an adverse jury instruction. *Id.* at 8–9. He offers exhibits in support of his motion (Docs. 73-1

through 73-8, Doc. 76-1; Pl. Mot. Exs. A-I).[5] On April 20, 2022, Plaintiff submitted an informal grievance, log # 215-2204-0159, in which he relayed the events that occurred in "H" dorm on April 5, 2022, including that an officer (whose name Plaintiff did not know at the time) threw a pair of handcuffs at him. *See* Pl. Mot. Ex. C at 2.[6] Plaintiff reported that the events were captured on video, and he noted, "I do have witnesses and your video." *Id.* On May 8, 2022, Plaintiff submitted a formal grievance, log # 2205-215-061, in which he relayed the events of April 5, 2022, and mentioned that the video footage from "H" dorm would support his allegations. *See* Pl. Mot. Ex. D at 2–4.

Plaintiff requested disclosure of the video footage during discovery. In an interrogatory response, Defendant Carter stated that the FDC's standard retention policy for fixed wing video footage is 30 days and no video footage of the April 5, 2022 incident exists "because it was never preserved and was deleted in accordance with [the FDC's] retention schedule." *See* Pl. Mot. Ex. G at 4; Pl. Mot. Ex. H at 2.

---

[5] Plaintiff filed supplemental exhibits (Doc. 76-1), which collectively he labeled exhibit H. However, with his motion, he filed exhibits A through H. The Court will reference the supplemental exhibits (Doc. 76-1) collectively as exhibit I.

[6] On the grievance, Plaintiff wrote the date as May 5, 2022, but the prison stamp and response indicate the prison received his grievance on April 26, 2022. *See* Pl. Mot. Ex. C at 2.

Defendants provide the following relevant exhibits in opposition to Plaintiff's motion: Defendants' responses to Plaintiff's requests for production (Doc. 82-1; Def. Resp. Ex. A); a copy of FDC's procedure number 602.033, titled in pertinent part, "Fixed Camera Digital Video Maintenance and Retention," effective January 13, 2022 (Doc. 82-2; Def. Resp. Ex. B ("FDC Retention Policy")); the declaration of Defendant Carter dated March 18, 2024 (Doc. 82-3; Def. Resp. Ex. C);[7] and the declaration of Stephanie Harris, Administrative Lieutenant at HCI, dated March 29, 2024 (Doc. 82-4; Def. Resp. Ex. D).

Defendants do not dispute that video footage of the April 5, 2022 incident no longer exists, explaining it was automatically overwritten pursuant to the FDC Retention Policy, which at the time, provided that fixed wing camera footage is to be retained for 30 days, after which such "recorders shall automatically record over previous recordings." *See* Def. Resp. Ex. B at 4, 7.[8] *See also* Def. Resp. Ex. A at 3; Def. Resp. Ex. C at 3; Def. Resp. Ex. D at 3. The FDC Retention Policy includes a definitions section, which provides in relevant part:

---

[7] Defendant Carter avers he has no recollection of speaking to or interacting with Plaintiff on April 5, 2022, but says that had Plaintiff reported abuse allegations to him, he "would have created an incident report or some type of documentation about the contact." *See* Def. Resp. Ex. C at 3. He does not recall having reviewed any video related to the alleged incident and is not a records custodian of such footage. *Id.*

[8] Much of this exhibit is redacted.

24

> (11) **Retention Schedule**, where used herein, refers to a 30-day period in which all surveillance and audio, where applicable, recordings shall be maintained for all Body Worn Cameras and Fixed Video Cameras unless the digital recording of a specified time period requires extended retention for investigative purposes related to criminal activity, inmate discipline, inmate grievance, or inmate litigation, etc. Deleting audio and video recordings from fixed camera systems, body worn cameras and the vendor's online storage database is strictly prohibited.

Def. Resp. Ex. B at 4. An inmate can request that video footage be "retained more than the 30-days [sic] in conjunction with formal grievance submissions," but if the Warden decides the recording "does not support the alleged issues asserted in the grievance," the Warden can deny the inmate's request for retention. *Id.* at 7. Additionally, the FDC Retention Policy provides that the Office of the Inspector General (OIG) "shall retain and retrieve all related video and audio recordings (if applicable) and reports whenever an inmate makes an allegation of abuse (staff or inmate), or staff misconduct." *Id.* at 5.

Finally, the FDC Retention Policy sets forth the steps that should be taken in the event video footage should be retained:

> (k) The following steps shall be taken if it is determined that a digital recording has captured a use of force incident or has been requested for further investigation/review:
>
> 1. If a digital recording device records the incident, a digital recording clip shall be produced and saved to a DVD, CD, or USB flash drive.

> 2. Immediately upon the removal of a digital
> recording clip from the recording device, a "Chain of
> Custody," DC1-801, shall be initiated and continued
> throughout the applicable routing and retention
> process.
> 3. The digital recording clip shall be retained
> and safeguarded appropriately as determined
> necessary by the Warden or staff of the [OIG].

*Id.* at 7.

Stephanie Harris avers she was "tasked to address" two inmate requests

Plaintiff submitted about the April 5, 2022 incident. *See* Def. Resp. Ex. D at 2.

In connection with her reviews, she watched "the video [that] Plaintiff alleged

would demonstrate Sergeant North throwing handcuffs across the wing and

hitting Plaintiff in the back of the head." *Id.* According to Harris, "the video did

not support Plaintiff's allegations" and, as such, she did not preserve the

footage.[9] *Id.* at 2–3.

In response to Defendants' assertion that the "video in this case . . . was

overwritten as a matter of course on May 5, 2022," *see* Def. Resp. at 3, Plaintiff

provides evidence suggesting the video footage was sent to or reviewed by

someone at the OIG after that date. First, he provides a document prepared on

June 3, 2022, by an employee of the OIG, Stephen Estes, which summarizes

---

[9] Harris prepared an incident report on April 28, 2022, in response to Plaintiff's inmate request, log # 2204-215-0159. *See* Def. Resp. Ex. E at 2. The incident report addressed solely Plaintiff's allegations against Officer "G," not his allegations against Defendant North. *See id.*

Plaintiff's complaints against Defendant North and notes, "Video footage was reviewed of the incident and the footage refutes [Plaintiff's] allegations." *See* Pl. Mot. Ex. I at 5. This document identifies Defendant North as a "suspect" and Defendant Carter as a "witness." *Id.*

Second, Plaintiff provides a MINS incident report prepared by Theresa Marie Fisher on May 19, 2022, which also summarizes Plaintiff's complaints against Defendant North. *Id.* at 6. In the MINS report, Harris is identified as the "complainant," and both Plaintiff and Defendant North are identified as "subjects." *Id.* Under the section labeled, "Action Taken," Fisher wrote, "The fixed wing video was reviewed and there is no evidence that substantiated [Plaintiff's] allegations," but the offending staff member (presumably Defendant North) "was reminded to remain professional and harassment towards inmates of any kind is strictly prohibited." *Id.*[10] Additionally, on the second page of the report, Fisher wrote twice more that video footage refuted Plaintiff's allegations. *Id.* at 7. It appears Fisher recommended the report be sent to the OIG. *See id.* at 6.

Attempting to reconcile or dispute Plaintiff's evidence suggesting video footage of the incident was reviewed after the 30-day retention period expired,

---

[10] The assigned log number for the inmate request that is mentioned in the MINS report (215-2204-0026) does not match either of the log numbers of the grievances Plaintiff provides.

Defendants posit that the Estes and Fisher reports can only be interpreted as a summary of Harris's review of the video footage given the FDC Retention Policy provides that video footage is automatically overwritten after 30 days. *See* Def. Resp. at 7. This proposition appears speculative on counsel's part. No FDC official says as much through a declaration or affidavit. The reports Plaintiff provides are not self-explanatory and certainly give the impression that video footage was sent to and reviewed by someone at the OIG after May 5, 2022.

Defendants further argue that, regardless of the potential ambiguity in the Estes and Fisher reports, the OIG has represented "multiple times that they do not have a copy of the video"; Plaintiff never sufficiently requested that it be retained in anticipation of litigation; they (Defendants North and Carter) never had control of any video footage, so cannot be held responsible for its disappearance or automatic disposal under the FDC Retention Policy; and the lack of video footage prejudices Defendants, not Plaintiff, because it would have disputed Plaintiff's allegations. *Id.* at 4, 7–9.

"Spoliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (internal quotation marks omitted) (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292,

1308 (11th Cir. 2003)). *See also Pandya v. Marriott Hotel Servs., Inc.*, 552 F.
Supp. 3d 1364, 1372 (N.D. Ga. 2021) ("Spoliation is the destruction or
significant alteration of evidence, or the failure to preserve property for
another's use as evidence in pending or reasonably foreseeable litigation.").
Rule 37 of the Federal Rules of Civil Procedure addresses a party's recourse if
electronically stored information that should have been preserved was not:

> If electronically stored information that should have
> been preserved in the anticipation or conduct of
> litigation is lost because a party failed to take
> reasonable steps to preserve it, and it cannot be
> restored or replaced through additional discovery, the
> court:
>
> **(1)** upon finding prejudice to another party from
> loss of the information, may order measures no greater
> than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with
> the intent to deprive another party of the information's
> use in the litigation may:
>
>> **(A)** presume that the lost information was
>> unfavorable to the party;
>>
>> **(B)** instruct the jury that it may or must
>> presume the information was unfavorable to the
>> party; or
>>
>> **(C)** dismiss the action or enter a default
>> judgment.

Fed. R. Civ. P. 37(e). A party seeking an adverse inference instruction under
Rule 37(e)(2) must demonstrate the spoliator acted in bad faith. *Tesoriero*, 965

F.3d at 1183 ("[A]nticipation of litigation is not the standard for spoliation sanctions—bad faith is"). *See also Pandya*, 552 F. Supp. 3d at 1373. In other words, negligently failing to preserve evidence is not sanctionable as "spoliation." *See Tesoriero*, 965 F.3d at 1184–85 (holding the plaintiff failed to establish a cruise line's bad faith in disposing of a chair that caused her injury because no one requested the chair be preserved, the chair was disposed of in accordance with policies on reporting passenger injuries, and there was no indication "the policies themselves . . . establish[ed] bad faith").

The "intent to deprive" language contained in Rule 37(e)(2) is the equivalent of "bad faith." *See Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023). A finding of an "intent to deprive" (or "bad faith") can be premised on circumstantial evidence, and "the reasonableness of preservation efforts depends in part on 'the party's sophistication with regard to litigation.'" *Id.* at 1313–14 (quoting advisory committee's note to 2015 amendments to Rule 37). A party's reliance on an ordinary retention policy "is not a silver bullet," especially when coupled with "a lack of any cogent explanation for [the] complete failure to make any effort to preserve [evidence]." *Id.* at 1302, 1313 (affirming imposition of spoliation sanctions where the defendant company failed to preserve crucial cell phone data or suspend ordinary cell phone destruction policies when a litigation hold was in

place). However, a party seeking spoliation sanctions under an "intent to deprive" theory must show the spoliator destroyed the information "for the purpose of hiding adverse evidence." *See Tesoriero*, 965 F.3d at 1184; *Skanska*, 75 F.4th at 1312.

To avail himself of relief afforded by Rule 37(e), Plaintiff must establish the following: (1) electronically stored evidence "should have been preserved in the anticipation or conduct of litigation"; (2) the evidence was not preserved or was lost; (3) the destruction or loss was caused by a party's "fail[ure] to take reasonable steps to preserve [the evidence]"; (4) the lost evidence cannot be "restored or replaced"; and (5) the loss prejudices him or the spoliator "inten[ded] to deprive" him of the evidence. *See* Fed. R. Civ. P. 37(e).

The parties dispute elements one, three, and five. *See generally* Pl. Mot.; Def. Resp. However, on this record, the Court cannot make an informed ruling. The relevant facts are not developed, and significant legal issues are not sufficiently briefed.[11] For instance (and not intended to be exhaustive), the following facts and issues are unclear: who reviewed the video footage of the relevant incident (only Harris, or others, including Estes and Fisher) and when; whether the footage was or should have been forwarded to the OIG

---

[11] Plaintiff is proceeding *pro se*, and Defendants cite only one non-binding case (which they improperly cite as an Eleventh Circuit case). *See* Def. Resp. at 11 (citing *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1321 (Fed. Cir. 2011)).

before or after the 30-day retention period set forth in the FDC Retention Policy expired; whether the footage should have been saved by the institution or the OIG under the FDC Retention Policy or relevant law; whether litigation should have been reasonably anticipated before the footage was overwritten or destroyed; whether conduct of FDC officials with video storage and review responsibilities can be imputed to Defendants under the circumstances;[12] and whether the loss of the video footage suggests bad faith or prejudices Plaintiff. Accordingly, the Court will deny Plaintiff's *pro se* motion without prejudice subject to his right to renew the motion through counsel if the parties are unable to settle the case.

For the reasons stated, it is now

**ORDERED:**

1.      Defendants' motion for summary judgment (Doc. 70) is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** only to the extent Defendant Carter is entitled to summary judgment on the deliberate

---

[12] District courts in other circuits have persuasively concluded that "spoliation committed by non-party prison officials could be imputed to defendant officials who did not themselves take part in the spoliation." *See, e.g.*, *Muhammad v. Mathena*, No. 7:14-cv-529, 2016 WL 8116155, at *7 (W.D. Va. Dec. 12, 2016), *report and recommendation adopted sub nom.*, 2017 WL 395225 (Jan. 27, 2017) (citing with approval *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1106 (D. Ariz. 2014)).

indifference claim against him. Judgment to that effect will be withheld pending adjudication of the action as a whole. *See* Fed. R. Civ. P. 54.

2.      This case is **REFERRED** to the Jacksonville Division Civil Pro Bono Appointment Program so the designated deputy clerk of the Court may seek counsel to represent Plaintiff. The Court encourages the parties to attempt to settle the case privately in the meantime. If settlement negotiations are successful, the parties shall immediately notify the Court.

3.      Plaintiff's motion for spoliation sanctions (Doc. 73) is **DENIED without prejudice** subject to his right to renew the motion through counsel if the case does not settle.

**DONE AND ORDERED** at Jacksonville, Florida, this 18th day of July 2024.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
James L. Kelly
Counsel of Record